UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| **Colleen Novit** and **Daniel** Novit, *individually and on behalf of their minor child,* **E.N.**, <br><br> Plaintiffs, <br><br> v. <br><br> **Metropolitan School District of Warren Township**, <br><br> Defendant. | Case No. 1:21-cv-02168-TWP-TAB |

---

# Plaintiff's Brief in Support of Response in Opposition to Defendants' Motion for Summary Judgment

---

Brandon E. Tate, Atty. No. 31531-49
Benjamin A. Spandau, Atty. No. 34207-49
Katherine A. Piscione, Atty. No. 37166-49
WALDRON TATE BOWEN SPANDAU LLC
156 E Market St, 5th Floor
Indianapolis, IN 46204
317.296.5294
F: 317.423.0772
brandon@wtbs-law.com
ben@wtbs-law.com
katie@wtbs-law.com
*Attorneys for Plaintiffs*

## **Table of Contents**

**Introduction** ....................................................................................1

**Standard** .........................................................................................2

**Statement of Material Facts in Dispute** ...........................................3

    1.  E.N.'s Early Life ....................................................................3

    2.  E.N.'s Medical Conditions......................................................5

    3.  Standard IEP Process for the MSD of Warren Township ......6

    4.  E.N.'s IEP with the MSD of Warren Township ....................7

    5.  April 19, 2018 ......................................................................10

    6.  E.N.'s Life After April 19, 2018 ..........................................13

**Argument** ......................................................................................14

    1.  Plaintiffs were not required to exhaust administrative remedies ........15

    2.  The Plaintiffs' substantive IDEA claim, IDEA § 1983 claim,
        substantive Section 504 claim, Section 504 § 1983 claim, substantive
        ADA claim, ADA § 1983 claim, and substantive due processs § 1983
        claim are not time barred .....................................................18

        a.  E.N. is not yet eighteen (18) years of age and the statute of
           Limitations is tolled under state law ...........................19

           i.  Section 1983 Claims – Counts V, VI, VII, and VIII ........20

           ii.  Direct claim under Section 504 – Count VI .....................21

           iii.  Direct claim under ADA – Count VII ..............................21

           iv.  Direct Claim under the IDEA – Count V.........................22

        b.  Plaintiff's claims relate back to the original complaint.............24

    3.  Actions may lie under § 1983 for violations of the IDEA and
        Section 504 ...........................................................................29

    4.  Material questions of fact exist as to whether Defendant refused to
        provide a reasonable modification and intentionally acted on the
        basis of E.N.'s disability to discriminate based on disability, which
        must be determined by a jury.................................................30

    5.  Summary Judgment is inappropriate for Plaintiff's Substantive
        Due Process Claim because material questions of fact exist as to
        whether Defendant's actions caused a state-created danger, which
        was plead in Plaintiffs' Amended Complaint under Indiana's notice
        pleading standard .................................................................33

**Conclusion** ...................................................................................35

**Certificate of Service**...................................................................36

**Comes now** Plaintiffs, Colleen Novit and Daniel Novit, individually and on behalf of their minor child, E.N., by counsel, and in support of their Response in Opposition to Defendants' Motion for Summary Judgment state as follows:

# Introduction

This is a case seeking redress for physical injuries suffered by E.N., a wheelchair bound disabled student that was previously diagnosed with cerebral palsy, epilepsy, and fetal alcohol syndrome among other things, while on a school bus of the Metropolitan School District of Warren Township ("MSD Warren") on his way home along with the derivative claim of his parents. The physical injuries were endured when a substitute bus monitor assigned to monitor E.N. and bus driver failed to identify or treat a seizure that lasted approximately at least twenty-one (21) minutes in contravention to the seizure action plan.[1] The failure was precipitated by the policies, customs, practices, training, actions, and inactions of MSD Warren.[2]

Plaintiffs' claims of redress seek monetary damages from MSD Warren under various state and federal laws.[3] Defendant now seeks partial summary judgment on

---

[1] See **Exhibit 1** – Sworn Report of Dr. Polly Westcott, Psy.D. and **Exhibit 2** – Curriculum Vitae of Dr. Polly Westcott, Psy.D.

[2] See **Exhibit 3** – Sworn Report of Dr. Linda Bluth, Ed.D. and Curriculum Vitae.

[3] The stance of this case is slightly different than a case solely against a municipality. The parties filed a stipulation effectuating the dismissal of the elementary school, transportation department, school board, Dena Cushenberry – the superintendent, Sheila Ramirez – the bus driver, and the then jane doe bus monitor – learned to be Laura Jane Thompson, and the Court approved it on May 11, 2020. The stipulation provided in relevant part (emphasis added):

> b. any actions or inactions of dismissed Defendants relating to this case, including the yet to be added bus monitor involved in the incident underlying this litigation, are actions or inactions of Metropolitan School District of Warren Township Schools;

1

Counts II, IV, V, VI, VII, and VIII of the Amended Complaint primarily for procedural reasons. For the following reasons, summary judgment as to all counts should be denied.

## Standard

Summary judgment is not "a vehicle for resolving factual disputes." *Waldridge v. American Hoechst Corp.*, 24 F. 3d 918, 920 (7th Cir. 1994).

> And because summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one take and one take only: to decide, based on the evidence of the record, whether there is any material dispute of fact that requires a trial. *Anderson v. Liberty Loppy, Inc.*, 477 U.S. 242, 249-250 (1986). 10 Wright, Miller & Kane § 2712, at 574-78.

*Id.* "If a reasonable fact-finder could find for the non-moving party, summary judgment is inappropriate." *Shields Enters. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (Summary judgment should be granted only if it appears that no reasonable trier of fact could find in favor of the nonmovant.). Finally, "on a motion for summary

---

c. if any actions or inactions of the dismissed Defendants related to this case, including the yet to be added bus monitor involved in the incident underlying this litigation, are found to establish liability for any of the claims, **that liability is applicable to the Metropolitan School District of Warren Township Schools**;

See **Exhibit 4** – *May 11, 2020 Stipulation and Order of the Marion County Superior Court* (emphasis added). As such, we must look at the claims as they exist against the dismissed individual Defendants as well, as their liability now flows through to the remaining Defendant, MSD Warren. Thus, this is not a typical § 1983 claim against a municipality that is solely viewed under *Monell*, and additionally encompasses respondeat superior type claims.

MSD Warren makes no argument that the liability of the dismissed parties that flow through to MSD Warren per the Stipulation should have summary judgment granted. Thus, that argument would be waived and is not available on reply, and the only matters here would be claims as it pertains to MSD Warren's direct liability precluding summary judgment on all counts as it relates to the liability that flows through from the individuals. Thus, even if the Court were to find summary judgment proper, it would only be partial limited to MSD Warren, and would not entail any Count in totality excluding liability of the dismissed individuals that flows through.

2

judgment all material facts and all inferences are construed in the light most favorable to the non-moving party." *Midwest Imports v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995).

Summary judgment is appropriate only if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Because summary judgment is a "drastic device," cutting off a party's right to present its case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Ambat v. City & Cty. of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014); see also *Peoples Outfitting Co., Inc. v. general Elec. Corp.*, 549 F.2d 42 (7th Cir. 1977); *Tankersley v. Albright*, 514 F.2d 956, 963 n. 8 (7th Cir. 1975).

## Statement of Material Facts in Dispute

### 1. E.N.'s Early Life.

E.N. was born October 1, 2010, in Bulgaria.[4] At the time of his birth, E.N. was diagnosed with fetal alcohol syndrome and cerebral palsy.[5] In 2014, at the age of four (4), E.N. was adopted by Colleen Novit and Daniel Novit and arrived in the United States in November 2014.[6]

In addition to the medical struggles, E.N. also struggled to emotionally transition to family life.[7] When E.N. first arrived in the United States, he spent

---

[4] **Exhibit 1**, Dr. Westcott Rep., p. 1; **Exhibit 5**, Deposition of Colleen Novit Transcript, p. 10, line 5.
[5] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[6] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[7] **Exhibit 5**, Colleen Novit Dep., p. 23, lines 24-25.

most of his time with Daniel, and became very attached to him.[8] However, when Daniel returned work, E.N. demonstrated signs of anxiety and distress, and was subsequently diagnosed with Reactive Attachment Disorder.[9] Due to the struggles with transitioning into family life, E.N. spent six (6) months in a rehabilitation facility.[10] Upon his discharge, E.N. was stable and was returned to his home.[11]

Despite these early struggles, E.N. continued to make progress with his motor and emotional skills.[12] Prior to April 19, 2018, E.N. could bench sit, get himself into a seated position with minimal assistance, roll to both sides, army crawl, stand without any assistance beyond a table for over a minute, and sit at a 90-degree angle without any support.[13] E.N. made emotional strides as well; he would play peekaboo with his parents, he loved engaging with his family and others around him, and he would play games.[14] Despite his initial attachment issues, his relationship with Colleen prior to April 2018 was the best it had ever been.[15] E.N. also enjoyed reading and had become verbal in the time since moving to the United States.[16] He was able to use words such as "Dada," "ball," and "book," and could use an iPad to select what he wanted from four (4) options.[17] Overall, E.N. was described as a happy child who would smile and giggle while interacting with family

---

[8] **Exhibit 1**, Dr. Westcott Rep., p. 2; **Exhibit 6**, Deposition of Daniel Novit Transcript p. 14, lines 6-14.
[9] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[10] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[11] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[12] **Exhibit 5**, Colleen Novit Dep., p. 36, line 23 through p. 39, line 2.
[13] **Exhibit 5**, Colleen Novit Dep., p. 36, line 24 through p. 37, line 20.
[14] **Exhibit 5**, Colleen Novit Dep., p. 37, line 22; **Exhibit 6**, Daniel Novit Dep., p. 20, lines 2-12.
[15] **Exhibit 5**, Colleen Novit Dep., p. 39, line 23 through p. 40, line 2.
[16] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[17] **Exhibit 1**, Dr. Westcott Rep., p. 3.

and others, he was responsive to touch and was happy when picked up.[18] All signs pointed to continued improvement and growing capabilities, despite E.N.'s early struggles.[19] In fact, in the time leading up to the incident on April 19, 2018, E.N. had no hospital visits since April of 2017.[20]

## 2. E.N.'s Medical Conditions.

E.N has been diagnosed with Fetal Alcohol Syndrome, Cerebral Palsy, Epilepsy, Microcephaly, Failure to Thrive, Posttraumatic Stress Disorder, significant cognitive disability, and orthopedic impairments.[21] For these conditions, E.N. was in full-time therapy.[22] E.N. was receiving physical therapy through an outpatient program as well as occupational therapy, physical therapy, and speech therapy through his school.[23] In each of these therapies, E.N. was showing improvement, meeting his benchmarks, and moving towards new goals prior to April 19, 2018.[24]

With regard to his epilepsy, E.N. experiences two (2) types of seizures.[25] The first type of seizure lasts generally from 45 seconds to 5 minutes.[26] This type of seizure is characterized by E.N. going limp and stopping his breathing.[27] The second type of seizure lasts from 25 seconds to 60 seconds.[28] This type of seizure is

---

[18] **Exhibit 1**, Dr. Westcott Rep., p. 3; **Exhibit 5**, Colleen Novit Dep., at p. 38, lines 9-10.
[19] **Exhibit 1**, Dr. Westcott Rep., p. 3, 7.
[20] **Exhibit 5**, Colleen Novit Dep., p. 39, lines 5-7.
[21] **Exhibit 1**, Dr. Westcott Rep., p. 4.
[22] **Exhibit 5**, Colleen Novit Dep., at p. 39, lines 8-11.
[23] **Exhibit 9**, Colleen Novit Dep., at p. 39, lines 14-16
[24] **Exhibit 9**, Colleen Novit Dep., at p. 39, lines 18-20.
[25] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[26] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[27] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[28] **Exhibit 1**, Dr. Westcott Rep., p. 3.

characterized by staring spells.[29] With either seizure, E.N.'s seizure action plan entails contacting the school nurse, calling 911 for transport to Riley, notifying the parents, and notifying a doctor if needed.[30] With either type, if the seizure lasts for five (5) minutes or longer, 5 mg of Diastat are to be administered.[31] If the seizure is ten (10) minutes or longer, a second round of 5 mg of Diastat should be administered.[32]

### 3. Standard IEP Process for the MSD of Warren Township.

When a student is identified as having a disability, they are eligible for an Individual Education Plan ("IEP"). Once a student is eligible for an IEP, several steps must occur in order for the IEP to be developed. First, a parent or the school can make a request for testing for consideration for special education eligibility.[33] Once that request is made, there is an informed consent meeting with the family and the school where concerns and areas of eligibility are discussed.[34] The parent or guardian then signs a consent for evaluation and the student is evaluated to determine eligibility.[35] After evaluation, a Case Conference Committee, consisting of a multidisciplinary team, is established in order to create an IEP for the student.[36]

In some instances, a student's IEP will include eligibility for special transportation.[37] When this occurs, members of the Transportation Department of

---

[29] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[30] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[31] **Exhibit 1**, Dr. Westcott Rep., p. 4; **Exhibit 5**, Colleen Novit Dep., p. 56, lines 19-21.
[32] **Exhibit 1**, Dr. Westcott Rep., p. 4.
[33] **Exhibit 7**, Deposition of Allison Woods Transcript, at p. 20, lines 8-10.
[34] **Exhibit 7**, Allison Woods Dep., at p. 20, lines 10-16.
[35] **Exhibit 7**, Allison Woods Dep. at p. 20, lines 17-20.
[36] **Exhibit 7**, Allison Woods Dep. at p. 20, line 20 through p. 21, line 3.
[37] **Exhibit 8**, Deposition of Jennifer Storm Transcript, at p. 15, lines 6-7.

the Metropolitan School District of Warren Township ("MSD of Warren Township") are invited to be a member of the Case Conference Committee.[38] This is especially true when the individual student is a more at-risk child.[39] This is because the Transportation Department has to be able to prepare the driver and the monitor for the student who will be getting on the bus so that the child can be appropriately protected and safely transported.[40]

When it is determined that a student will need transportation services, it is the responsibility of the director of transportation or the department of transportation to participate in the Case Conference Committee IEP process.[41] The director of transportation or the transportation department is to work collaboratively with the Case Conference Committee to determine the need for transportation under the IDEA.[42] The director of transportation or the department of transportation is responsible for gathering the appropriate information from the parents and other members of the IEP team so that it can be ensured the child will be transported safely.[43]

When a need for transportation is identified, a special transportation form is completed and shared with special transportation.[44] The form includes information

---

[38] **Exhibit 8**, Jennifer Storm Dep., at p. 15, lines 11-12.
[39] **Exhibit 8**, Jennifer Storm Dep., at p. 15, lines 13-15.
[40] **Exhibit 8**, Jennifer Storm Dep., at p. 15, lines 15-18.
[41] **Exhibit 8**. Jennifer Storm Dep., at p. 16, lines 1-5.
[42] **Exhibit 8**, Jennifer Storm Dep., at p. 16, lines 6-9.
[43] **Exhibit 8**, Jennifer Storm Dep., at p. 16, line 10 through p. 17, line 3.
[44] **Exhibit 7**, Allison Woods Dep., at p. 36, lines 13-20.

relating to the student's unique needs such as a behavior plan and a healthcare plan.[45]

### 4. E.N.'s IEP with the MSD of Warren Township.

Due to E.N.'s medical conditions and disabilities, he was eligible for an IEP. An IEP was put together by the staff at Lincoln Elementary School in Janesville, Wisconsin.[46] This IEP determined that E.N. would need individual instruction in all areas of learning and that assistive technology may be required.[47] In July of 2017, the Novit family moved to Indiana.[48] E.N. was to start 1st grade in the fall of 2017, so a new IEP had to be created with the MSD of Warren Township.[49]

On August 10, 2017, the MSD of Warren Township completed a Case Conference Committee Report ("CCC Report").[50] The purpose of the CCC Report was to establish E.N.'s initial IEP with the MSD of Warren Township.[51] Much of the information contained in the CCC Report was taken from E.N.'s prior IEP completed in Wisconsin in 2015.[52] Present at this meeting were E.N., Colleen. Tomeka Johnson (Public Agency Rep), Amy May (Teacher of Record), Gwendolyn Cole (Instructional Strategist), Jean Greven (Occupational Therapy), Lori Tenbarge (Physical Therapy), Kelly Hartman (SLP), and Kim Howard (Health Care Coordinator).[53] Notably missing from the meeting was anyone from the MSD of

---

[45] **Exhibit 7**, Allison Woods Dep., at p. 36 line, 22 through p. 37, line 1.
[46] **Exhibit 9**, October 7, 2015 IEP.
[47] **Exhibit 1**, Dr. Westcott Rep., p. 3.
[48] **Exhibit 5**, Colleen Novit Dep., at p. 26, lines 21-23.
[49] **Exhibit 5**, Colleen Novit Dep., at p. 50, lines 3-6.
[50] **Exhibit 10**, August 10, 2017 CCC Report.
[51] **Exhibit 10**, August 10, 2017 CCC Report, p. 1.
[52] **Exhibit 10**, August 10, 2017 CCC Report.
[53] **Exhibit 10**, August 10, 2017 CCC Report, p. 10.

Warren Township's Transportation Department.[54] Despite the fact that no one from the MSD of Warren Township's Transportation Department was present when the CCC Report was created, a special transportation form for E.N. was completed.[55] This report identified that E.N. would need adult supervision from curb to curb.[56] The form also specified that E.N. has a seizure disorder, is non-verbal, carries Diastat with him, and is in a manual wheelchair.[57]

On October 30, 2017, a revised Case Conference Committee Report was created for E.N.[58] In this report, it is noted under the heading "Transportation" that E.N. is non-verbal, transported in a wheelchair, and needs to be closely monitored for seizure activity.[59] Concerns regarding E.N.'s transportation to and from school on the bus were discussed at this meeting.[60] Specifically, the Case Conference Committee agreed that **both** the driver and the monitor on E.N.'s bus will be trained in his Diastat protocol.[61] The Healthcare Coordinator and the Principal were tasked with scheduling the Diastat training for appropriate staff members.[62] Once again, no member from the MSD of Warren Township's Transportation Department was present at this meeting.[63]

---

[54] **Exhibit 8**, Jennifer Storm Dep., at p. 51, lines 13-24.
[55] **Exhibit 10**, August 10, 2017 CCC Report, p. 4.
[56] **Exhibit 10**, August 10, 2017 CCC Report, p. 4.
[57] **Exhibit 10**, August 10, 2017 CCC Report, p. 4.
[58] **Exhibit 11**, October 30, 2017 CCC Report.
[59] **Exhibit 11**, October 30, 2017 CCC Report, p. 9.
[60] **Exhibit 11**, October 30, 2017 CCC Report, p. 13.
[61] **Exhibit 11**, October 30, 2017 CCC Report, p. 13.
[62] **Exhibit 11**, October 30, 2017 CCC Report, p. 15.
[63] **Exhibit 11**, October 30, 2017 CCC Report, p. 13.

On January 26, 2018, a revised Case Conference Committee Report was created for E.N.[64] Again, under the heading of "Transportation" it is noted that E.N. is non-verbal, transported in a wheelchair, and needs to be closely monitored for seizure activity.[65] The Committee discussed special transportation needs, yet once again, no member of the MSD of Warren Township's Transportation Department was present at this meeting.[66] It was also noted at this meeting that the Nurse coordinator had not seen the seizure care plan from the physician.[67] However, the Nurse Coordinator, Kim Howard, BSN, RN, signed E.N.'s Seizure Action plan on December 8, 2017, more than one (1) month before this Case Conference Committee Report was created.[68] This plan stated that for any seizure lasting for five (5) minutes or more, E.N. was to receive 5 mg of Diastat.[69]

## 5. April 19, 2018

On April 19, 2018, E.N. was riding the school bus home when he had a partial complex seizure.[70] Prior to boarding the bus, E.N.'s teacher, Amy May, described E.N. as smiling and giggling and completely alert and awake.[71] On April 19, 2018, E.N.'s bus had a substitute bus attendant, Laura "Jane" Thompson ("Thompson").[72] Prior to April 19, 2018, Thompson had no initial training beyond

---

[64] **Exhibit 12**, January 26, 2018 CCC Report.
[65] **Exhibit 12**, January 26, 2018 CCC Report, p. 9.
[66] **Exhibit 12**, January 26, 2018 CCC Report, pp. 12, 14.
[67] **Exhibit 12**, January 26, 2018 CCC Report, p. 13.
[68] **Exhibit 13**, E.N. Seizure Action Plan.
[69] **Exhibit 13**, E.N. Seizure Action Plan.
[70] **Exhibit 1**, Dr. Westcott Rep., p. 1.
[71] **Exhibit 9**, Colleen Novit Dep., at p. 64, lines 10-12.
[72] **Exhibit 3**, Dr. Bluth Rep., pp. 3, 8; **Exhibit 9**, Colleen Novit Dep., at p. 60, lines 4-7.

bus driver training.[73] Specifically, Thompson had no special needs training or medical training.[74] Prior to being assigned as the bus monitor, Thompson was not told what E.N.'s medical conditions were, she had no training on seizure recognition or symptoms, no training on seizure treatment, and no Diastat training.[75]

At 4:03 p.m., Thompson asked the bus driver "does he need to stay awake?" and comments "he keeps bobbing."[76] At 4:08 p.m., Thompson appears to become more aware that E.N. is "sleeping" and that his "head is down."[77] At 4:11 p.m., it is noted that E.N. is not breathing and Thompson asks E.N. to wake up for her.[78] Thompson continues to insist that E.N. is just sleeping and is "out like a light", although she also notes she has to hold his head for him.[79] Thompson states that she can see E.N. chest moving indicating breathing, but he will not wake up.[80] Thompson continues to try and wake E.N. but patting his face and calling to him, but nothing she does wakes him up and notes that if she does not hold his head then it will not stay up.[81] Just before 4:17 p.m., Ramirez pulls the bus over and goes to E.N. and attempts to arouse him.[82] When she is unable to arouse him, Ramirez contacts Colleen.[83]

---

[73] **Exhibit 14**, Deposition of Laura Thompson Transcript, at p. 7, lines 8-12.
[74] **Exhibit 14**, Laura Thompson Dep. at p. 7, lines 12-15.
[75] **Exhibit 14**, Laura Thompson Dep. at p.12 line 11 through p. 13 line 7.
[76] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[77] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[78] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[79] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[80] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[81] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[82] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[83] **Exhibit 1**, Dr. Westcott Rep., p. 2; **Exhibit 5**, Colleen Novit Dep., at p. 62, lines 19-22.

When Ramirez contacted Colleen, she informed her that E.N. was unresponsive and they could not tell if he was breathing.[84] Colleen asked Ramirez if she had called 911, and upon learning that she had not, instructed Ramirez to hang up the phone and call 911.[85] From the surveillance video, it appears that Ramirez calls EMS around 4:19 p.m. and dispatch confirms EMS will be sent at 4:21 p.m.[86] Just before 4:22 p.m., Thompson and Ramirez moved E.N. to the floor.[87] At this point, E.N. is still unresponsive at this time.[88]

After Colleen hung up the phone with Ramirez, she attempted to contact the school in order to determine the bus's location so that she could meet them.[89] When Colleen arrived at the scene, there was a car, an SUV, an ambulance, a firetruck, E.N.'s teacher, Amy May, E.N.'s principal, Tomeka Johnson, Ramirez, and Thompson.[90] E.N. was already in the ambulance when Colleen arrived.[91] Colleen went straight to the ambulance to speak to the paramedics.[92] At this point, she was informed that E.N. was currently stable but "definitely out of it."[93] The paramedics asked if Colleen was comfortable transporting E.N. to the hospital or if she wanted them to take him by ambulance.[94] Colleen opted to take E.N. herself due to E.N.'s

---

[84] **Exhibit 5**, Colleen Novit Dep., at p. 62, lines 20-22.
[85] **Exhibit 5**, Colleen Novit Dep., at p. 63, lines 2-12.
[86] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[87] **Exhibit 1**, Dr. Wescott Rep., p. 2.
[88] **Exhibit 1**, Dr. Westcott Rep., p. 2.
[89] **Exhibit 5**, Colleen Novit Dep., at p. 63, lines 5-8.
[90] **Exhibit 5**, Colleen Novit Dep., at p. 66, lines 8-10.
[91] **Exhibit 5**, Colleen Novit Dep., at p. 66, lines 12-13.
[92] **Exhibit 5**, Colleen Novit Dep., at p. 66 lines 19-20.
[93] **Exhibit 5**, Colleen Novit Dep., at p. 66 lines 20-22.
[94] **Exhibit 5**, Colleen Novit Dep., at p. 66 lines 22-23.

history of trauma.[95] Colleen picked E.N. up and transported him to her car and buckled him into his car seat.[96] Colleen then asked one of the paramedics to make sure that E.N.'s breathing was ok because he could still not hold his head up at all.[97] Colleen and the paramedic then took some pillows or blankets and stacked them around his neck in an attempt to hold E.N.'s head up.[98] Colleen then took E.N. to the emergency room at Riley.[99]

On the way to the emergency room, Colleen had to pull over twice because E.N. had a thick, slimy secretion coming from his mouth which was causing him to gag because he could not support his head.[100] Colleen arrived at the emergency room sometime between 5:30 and 6:00 p.m.[101] Colleen carried E.N. into the emergency room where they were immediately taken into a room.[102] At this point, E.N. was completely unresponsive and limp in Colleen's arms.[103] E.N. was not admitted to the hospital on April 19, 2018, after he was stabilized because the doctors determined that there was nothing they could do at that point.[104] However, E.N. was monitored for several hours before he was discharged sometime between 11:00 p.m. and 1:00 a.m.[105]

**6.  E.N.'s life after April 19, 2018.**

---

[95] **Exhibit 5**, Colleen Novit Dep., at pp. 66 line 25 through p. 67 line 2.
[96] **Exhibit 5**, Colleen Novit Dep., at p. 69, lines 3-5.
[97] **Exhibit 5**, Colleen Novit Dep., at p. 69, lines 5-7.
[98] **Exhibit 5**, Colleen Novit Dep., at p. 69, lines 8-10.
[99] **Exhibit 5**, Colleen Novit Dep., at p. 69, line 10.
[100] **Exhibit 5**, Colleen Novit Dep., at p. 69, lines 17-20.
[101] **Exhibit 5**, Colleen Novit Dep., at p. 70, lines 24-25.
[102] **Exhibit 5**, Colleen Novit Dep., at p. 71, lines 3-8.
[103] **Exhibit 5**, Colleen Novit Dep., at p. 71, lines 4-7.
[104] **Exhibit 5**, Colleen Novit Dep., at p. 71, lines 12-16.
[105] **Exhibit 5**, Colleen Novit Dep., at p. 71, line 17 through p. 72, line 20.

Following the events of April 19, 2018, E.N. has declined significantly.[106] Cognitively, E.N. is no longer able to produce intentional speech or words.[107] Instead, he will smack his lips, but will not verbalize.[108] He now has a limited attention span and limited engagement with others.[109] Instead of interacting with family members or others, E.N. is now content to stare off into space.[110] He doesn't play anymore because he is almost always stuck in an adaptive seating device rather than being able to be down on the floor with his siblings.[111]

Physically, E.N. now needs help getting into a seated position and can no longer stay seated without assistance.[112] As a result, E.N. now requires a new wheelchair that has a five-point harness that completely straps across his chest in order to hold him upright.[113] Additionally, E.N. can no longer use his gait trainer due to lack of strength in his torso and the inability to bear weight in his legs.[114] Due to his lack of bodily control, E.N. is forced to wear his neck brace 95 percent of the time.[115] E.N. is also sleeping more frequently than he was before, increasing from one (1) nap a day to four (4).[116] Due to his lack of muscle control and inability to protect his airway, E.N. is no longer able to eat by mouth at all and bathing has

---

[106] **Exhibit 5**, Colleen Novit Dep., at p. 97, lines 2-3.
[107] **Exhibit 1**, Dr. Westcott Rep., p. 4.
[108] **Exhibit 5**, Colleen Novit Dep., at p 112, lines 11-12.
[109] **Exhibit 1**, Dr. Westcott Rep., p. 4.
[110] **Exhibit 5**, Colleen Novit Dep., at p. 115, lines 8-11.
[111] **Exhibit 5**, Colleen Novit Dep., at p. 98, lines 13-16.
[112] **Exhibit 5**, Colleen Novit Dep. at p. 97, lines 6-8.
[113] **Exhibit 5**, Colleen Novit Dep. at p. 97, lines 16-18.
[114] **Exhibit 5**, Colleen Novit Dep. at p. 97, lines 10-12.
[115] **Exhibit 5**, Colleen Novit Dep. at p. 99, line 10.
[116] **Exhibit 1**, Dr. Westcott Rep., p. 4.

become more difficult.[117] E.N. is far from his baseline that had been established prior to April 19, 2018.[118]

# Argument

Defendant has sought summary judgment on Counts II, IV, V, VI, VII, and VIII of the Amended Complaint, either in whole or in part. For the following reasons, Defendant's request for partial summary judgment should be denied.

### 1. **<u>Plaintiffs were not required to exhaust administrative remedies.</u>**[119]

Defendant's argument centers around one single[120] case, *Fry v. Napoleon Community School*, 137 S.Ct. 743 (2017), and can be summed up in a single sentence: a denial of "free appropriate public education" ("FAPE"), whether alleged or not, exists in Plaintiffs' Amended Complaint, Plaintiffs were therefore required to exhaust administrative remedies under the IDEA, and Plaintiffs failed to do so barring several of Plaintiffs' claims. However, Plaintiffs did not have to exhaust administrative remedies because *the relief sought in this action is not available under the IDEA administrative procedures.*

---

[117] **Exhibit 1**, Dr. Westcott Rep., p. 4; **Exhibit 5**, Colleen Novit Dep. at p. 98, lines 16-25.
[118] **Exhibit 5**, Colleen Novit Dep. at p. 104, lines 13-18.
[119] Defendant appears to make the argument on this applicable to all new claims from the Amended Complaint, including the Counts II and IV – *negligence per se* based upon violations of the IDEA. Defendant does not cite to anything that would bar a *negligence per se* action at the state law level due to a failure to exhaust. In fact, nothing in the statute bars a state law claim predicated on a violation of IDEA if there is a failure to exhaust administrative remedies. There is only a limitation of the Constitution, ADA, Rehabilitation Act, and other **Federal** laws. See 20 U.S.C. § 1415(l). This argument can be summarily denied as it pertains to the Count II and IV *negligence per se* claims.
[120] The bulk of the argument contained in this section of Plaintiffs' Response and the authorities adverse to Defendant's position cited in this section have been previously disclosed to Defendant on several occasions throughout this litigation. In fact, the argument and authorities are even contained in Plaintiff's Response to the Request for Admissions designated by Defendant as Exhibit I. [Dkt. 34-4].

Plaintiffs were not required to exhaust any administrative remedies to pursue this litigation as no monetary remedies are available for personal injuries, physical injuries, permanent physical injuries, and any other damages sought herein under the 511 I.A.C. § 7-45-3 or IDEA administrative processes. See *McCormick v. Waukegan Sch. Dist. #60*, 374 F.3d 564, 568-69 (7th Cir. 2004) ("if the plaintiff has alleged injuries that cannot 'be redressed to any degree by the IDEA's administrative procedures and remedies[,]' then it would be futile to exhaust, and the disabled individuals can bring their disputes directly to court.") (quoting *Padilla v. Sch. Dist. No. 1*, 233 F.3d 1268, 1274-75 (10th Cir. 2000) (holding that a disabled student who suffered a fractured skull and exacerbation of a seizure disorder when she was placed in an unsupervised windowless closet did not need to exhaust because the claim was brought "solely to redress" the physical injuries and was outside of the scope of IDEA)); (citing *Witte v. Clark County Sch. Dist.*, 197 F.3d 1271, 1275-76 (9th Cir. 1999) (holding exhaustion to be unnecessary and distinguishing *Charlie F.* by pointing to physical abuse and injuries and the lack of possible remedies under IDEA's administrative processes that could address the plaintiff's damages)).

Defendant conflates the nature of the claim as being educational because of an allegation of FAPE. However, the claims sought to be remedied are not educational in nature. *Id*. at 569 ("In Eron's case, his complaint asserts that he suffered permanent physical injuries that will reduce the quality of his life--and perhaps even shorten it. The nature of his claim is not educational; no change to his

16

IEP could remedy, even in part, the damage done to Eron's body."). No change to an IEP could remedy, even in part, the damage to E.N.'s body.

In fact, unlike the Defendant's objection to Plaintiff's Motion for Leave to Amend filed in State Court[121], the current motion differs in that it avoids altogether a mention of futility by not citing or using the same language that it previously used in state court. This is likely because Plaintiff's Reply in Support of said motion for leave[122] identified that Defendant's Response contained a partial quotation that excluded a sentence. *Fry* specifically stated that while it was not addressing the futility issue in a footnote, all parties agreed administrative exhaustion was not required:

> Is exhaustion required When the plaintiff complains of the denial of a FAPE, but the specific remedy she requests-here, money damages for emotional distress-is not one that an IDEA hearing officer may award? **The Frys, along with the Solicitor General, say the answer is no.**

*Fry*, 137 S.Ct. at fn. 4. (omitted portion of quotation from Defendant's original response emphasized).

The guiding case on "futility" would be *McCormick v. Waukegan Sch. Dist. #60*, 374 F.3d 564 (7th Cir. 2004). The Seventh Circuit has made clear, and consistently upheld, the standard that "if the plaintiff has alleged injuries that cannot 'be redressed to any degree by the IDEA's administrative procedures and remedies[,]' then it would be futile to exhaust, and the disabled individuals can

---

[121] **Exhibit 6** – Defendant's Response in Opposition to Plaintiff's Motion for Leave to Amend Complaint.
[122] **Exhibit 7** – Plaintiff's Reply in Support of Motion for Leave to Amend Complaint.

bring their disputes directly to court." *Id.* at 568-569; (internal quotations omitted).

In *McCormick*, the Court held:

> In Eron's case, his complaint asserts that he suffered permanent physical injuries that will reduce the quality of his life – and perhaps even shorten it. The nature of his claim is not educational; no change to his IEP could remedy, even in part, the damage done to Eron's body
> . . .
> After closely examining the "theory behind the grievance" in Eron's complaint, we are convinced that it would be futile for Eron to exhaust the administrative process under the circumstances of this case because IDEA does not provide a remedy for his alleged injuries, which are non-educational in nature.

Id. at 569. As was the case in *McCormick*, in Plaintiffs' amended complaint, it has been asserted that Plaintiff suffered neurological and physical regression in his condition and an overall regression in his medical state and personal injuries for which monetary remedies are being sought. Therefore, while not included in Defendant's argument on this matter, the futility of the administrative proceedings under the IDEA for these circumstances deem it unnecessary to exhaust administrative remedies.

Additionally, as admitted by Defendant, the exhaustion only applies to civil actions under the Constitution, ADA, Section 504, and other federal laws **seeking relief that is also available under the IDEA administrative procedures**. 20 U.S.C. § 1415(l). The relief sought under Counts II, IV, VI, VII, and VIII, *namely monetary damages for physical injuries*, is not relief available under the IDEA administrative remedies.

As such, Defendant's request for summary judgment based on a failure to exhaust administrative remedies should be denied.

18

**2.  The Plaintiffs' substantive IDEA claim, IDEA § 1983 claim, substantive Section 504 claim, Section 504 § 1983 claim, substantive ADA claim, ADA § 1983 claim, and substantive due process § 1983 claim are not time barred.[123]**

Preliminarily, on March 6, 2020, the Governor Executive Order 20-02[124] which declared a public health emergency throughout the State of Indiana because of the coronavirus disease which had been deemed a global pandemic. Said order was extended and in place through its recission on March 3, 2022 at 7:00 p.m.[125] Pursuant to Indiana Code 34-7-6-2, a "judge, body, or official has authority to: (1) find and declare: (A) the existence of an emergency; and (B) the time during which the emergency existed; and (2) enter the finding and declaration in the record." Emergencies include those by reason of pestilence (or a contagious or infections epidemic disease that is virulent and devastating). COVID-19 clearly qualifies as such. Ind. Code § 34-7-6-3 institutes a stay during times of emergency: "*In computing the time within which the act is required to be done under the limitations fixed by law or rule, the time during which such emergency existed shall be excluded, and shall not be considered.*" When taking into account the tolling period of March 6, 2020 through March 3, 2022 for any claims guided by a state statute of limitations as set forth below – *which is all*, the Amended Complaint filed on April 26, 2021 for an incident that occurred on April 19, 2018 was timely.

a.  <u>E.N. is not yet eighteen (18) years of age and the Statute of Limitations is tolled.</u>

---

[123] Federal courts must take the state's tolling rules along with the statute of limitations. See *Board of Regents v. Tomanio*, 446 U.S. 478, 483-86 (1980); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463-65 (1975).
[124] **Exhibit 18** – State of Indiana Executive Order 20-02.
[125] **Exhibit 19** – State of Indiana Executive Order 22-09.

19

Defendants assert a statute of limitations argument as to Counts V, VI, VII, and VIII. Not only is E.N. a minor child, but he is also disabled qualifying for protections, as admitted by Defendant.[126] Counts V, VI, and VII each contain two separate and distinct claims – 1) *direct claims under the federal statutes cited for violations of said statutes;* and 2) *§ 1983 claims predicated upon violations of said cited federal statutes.* Count VIII is clearly a § 1983 claim.

### i. Section 1983 Claims – Counts V, VI, VII, and VIII

Starting with the § 1983 claims, contrary to Defendant's conclusory statement that the IDEA statute of limitations should apply to these, the Seventh Circuit looks to state law to determine the statute of limitations, tolling, and details of application on § 1983 claims. *Anderson v. Romero*, 42 F.3d 1121, 1123-24 (7th Cir. 1994); *Ray v. Maher*, 662 F.3d 770, 772-73 (7th Cir. 2011). The applicable limitation is two (2) year Indiana state personal injury statute of limitation. Ind. Code § 34-11-2-4; *Wilson v. Garcia*, 471 U.S. 261, 280 (1985).

Looking at tolling, Ind. Code § 34-11-6-1, "[a] person who is under legal disabilities when the cause of action accrues may bring the action within two (2) years after the disability is removed." Ind. Code § 1-1-4-5(a)(8) defines an "infant" or "minor" as a person under the age of eighteen (18). Additionally, Ind. Code § 1-1-4-5(a)(24) defines "under legal disabilities" to include persons less than eighteen (18) years of age and mentally incompetent. E.N. is a minor, disabled, and mentally incompetent as is undisputed. The statute of limitations for E.N. is still tolling. As

---

[126] Dkt. 37, Defendant's Brief in Support of Motion for Summary Judgment, p. 24.

such, Defendant's request for summary judgment based upon a failure to meet the statute of limitations for the four (4) § 1983 claims contained within Counts V, VI, VII, and VIII should be denied as they are tolled under Indiana law.

### ii. Direct claim under Section 504 – Count VI[127]

The direct claim portion of Count VI, "[s]ection 504 of the Rehabilitation Act contains no statute of limitations, so the Seventh Circuit courts are to borrow the two-year statute of limitations applicable to personal injury suits in [the state the action accrued]." *Loch v. Bd. of Educ.*, 573 F.Supp.2d 1072, 1079 (S.D. Ill. 2008) (citing *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 933 (7th Cir. 1993)). As such, contrary to Defendant's assertion, the Indiana statute of limitations applicable to personal injury suits in Indiana would apply here along with tolling under Indiana laws. Thus, as is the case with the § 1983 claims, the direct claim under Section 504 contained under Count VI's statute of limitations was tolled.

### iii. Direct Claim under ADA – Count VII

As it pertains to the direct ADA claim, these claims are also governed by the state statute of limitations for personal injury claims and minority/disability tolling rules. *Cordova v. Univ. of Notre Dame Du Lac*, 936 F.Supp.2d 1003, 1007 (N.D. Ind. 2013); see also *Soignier v. Am Bd. of Plastic Surgery*, 92 F.3d 547, 551 11.3 (7th Cir. 1996); see also *Piquard v. City of E. Peoria*, 887 F.Supp. 1 106 (C.D. Ill. 1995); see

---

[127] Defendant's claim based on one third circuit case that the direct IDEA claim statute of limitations should replace the state statute of limitations for the ADA and Section 504 is without authority and is contrary to established Seventh Circuit precedent that is binding. As set forth herein, § 1983, direct Section 504, and direct ADA claims have been established in our circuit to follow the state statute of limitations for injury claims also subjecting them to the tolling laws of the state. Additionally, it is not even clear the IDEA has an applicable statute of limitations to this circumstance.

also *Doe v. County of Milwaukee*, 871 F. Supp. 1072, 1077-78 (E.D. Wis. 1995). As such, the Indiana statute of limitations applicable to personal injury suits in Indiana would apply here and tolling under Indiana law again applies. Thus, the same outcome results as the § 1983 claims set forth above occurs for the direct claim under ADA contained within Count VII.

### iv. Direct Claim under the IDEA – Count V

Lastly, as it pertains to the direct IDEA claim contained under Count V, state law also governs on statute of limitations. 20 U.S.C. §1415(f)(3)(C) provides as follows:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this part [20 USCS §§ 1411 et seq.], in such time as the State law allows.

First, contrary to Defendant's statement on claim accrual being occurrence based, as noted in the plain language of the IDEA, this is not a strict occurrence rule. The statute pegs the limitations period to the date on which the parent or agency "knew or should have known about the alleged action that forms the basis of the complaint," not the date on which the action occurred. Defendant has not met its burden in showing there is no question of fact and that they are entitled to judgment as a matter of law on the assertion that Plaintiffs knew or should have known of the actions underlying the direct IDEA claim, and in fact have not even addressed it in their brief – *thus establishing another argument waived by Defendant and improper for reply*. As such, summary judgment would be improper

on this basis alone. It is unclear how Plaintiffs could have known that the Defendant provided no child specific knowledge or sufficient training to the Defendant's employees leading to this incident, along with other items that led to the amendment of the claims in this case, until that information was received through discovery in the lawsuit; namely, depositions.

Next, inclusive in the statute is "or, . . .in such time as the State law allows." Here, state law does set this. See 511 IAC 7-45-3(c) (requiring a due process hearing request to entail alleged actions forming the basis of the request that occurred in the last two years). As such, state law applies to the statute of limitations and the correlating tolling applies as well.

Finally, not only has it already been shown Plaintiffs did not need to request a due process hearing as set forth above, but there is also the issue present as to whether a statute of limitations exists under the IDEA where administrative exhaustion is not required. That is because what is referenced as a statute of limitations is simply a deadline applicable to parties that must exhaust administrative remedies. That same deadline can't be applied in this situation, otherwise, illogically, any case filed without exhausting administrative remedies because they are futile could potentially be dismissed by Defendant's once the ongoing litigation passes the two (2) year mark from the incident for a failure to file a for a due process hearing. If federal law does not provide a statute of limitations. Congress oftentimes fails to provide a statute of limitations in federal legislation. See *Board of Regents v. Tomanio*, 446 U.S. 478, 483 (1980). When this absence

occurs in federal statutes enacted before December 1, 1990, such as the IDEA, the federal courts, left without guidance on an issue that is quintessentially legislative in nature, must "borrow" a limitations period. As a rule, the most analogous state limitation period is "borrowed." *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985). It is understood that Congress ordinarily "intends by its silence that we borrow state law." *Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 147 (1987).

As shown by the ADA and Section 504 analysis above, the most analogous for this claim would be the personal injury statute of limitations of two (2) years, and with that comes the tolling laws of the state. As such, and as set forth in detail above, E.N.'s position as a disabled minor and the existence of a state of emergency in Indiana have sufficiently tolled this action for it to be timely filed.

### b.  Plaintiff's claims relate back to the original Complaint.

As a preliminary matter,[128] as the Amended Complaint in this action was filed while the case was still in state court, the state trial rule applies. "The Federal Rules make clear that they do not apply to filings in state court, even if the case is later removed to federal court." *Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1122 (7th Cir. 2001); Fed. R. Civ. P. 81(c) (federal rules govern in removal cases only "after it is removed"). Accordingly, Indiana's rules on relation back apply in this

---

[128] Defendant's argument on this section, while referencing in passing that Fed. R. 15(c) is mirrored by Ind. Tr. R. 15(c), makes no reference or argument as to Ind. Trial Rule 15(c) beyond this. All argument contained is applying Fed. R. 15(c), which is not applicable. Relation back analysis does not fall under the Federal Rules in this situation. If Defendant attempts to argue on Reply this matter under Ind. Tr. R. 15(c) that relation back is inapplicable and state case law thereon, it would be advancing a new legal theory for the first time, which is barred. *Anderson v. Donahoe*, 699 F.3d 989, 998 (collecting cases).

24

instance, not federal. Indiana's rule governing relation back of amendments to pleadings states in relevant part:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

Ind. R. Tr. P. 15(C).

The incident underlying this action occurred on April 19, 2018. The Plaintiffs filed their Complaint on April 17, 2019. After conducting extensive discovery, Plaintiffs moved for leave to amend their complaint on April 26, 2021 to add additional counts. As part of this process, Plaintiff's provided more specific factual allegations in the Complaint. Plaintiff could have just regurgitated the same exact factual allegations and simply added the Counts.[129] What occurred in this case is discovery occurred, new claims were discovered, and the Complaint was thus amended to reflect this, which is the purpose of relation back:

> The purpose of the doctrine of relation back is to allow a party who, through the course of discovery, realizes a new claim or defense the opportunity to use this claim or defense despite the running of the statute of limitations. Allowing liberal amendment to pleadings affords all parties the opportunity to present a complete picture of the issues involved in a lawsuit to the trier of fact. *Allied Mills, Inc. v. P.I.G., Inc.* (1983), Ind. App., 454 N.E.2d 1240, 1242. This policy is not prejudicial to nor does it place an undue hardship upon defendants. Once a defendant receives notice of a claim or defense raised against him, he should be aware that he may be subject to any possible additional claims or defenses stemming from "the general injury and general conduct" at issue and not merely those claims or defenses resembling those already pled. It would be difficult indeed for such a defendant, currently involved in litigation over an issue arising from a particular matter, to contend that he had no notice that he might be taken to task over a second issue arising out of the same matter.

---

[129] Indiana Trial Rule 8(a) – Indiana is a notice pleading state.

> The policy upon which statutes of limitation are premised, viz.
> guarding against stale claims, lost evidence and faulty memories of
> witnesses, is not endangered by this application of the relation back
> doctrine. Once a claim has been made, a defendant is put on notice
> that the factual circumstances surrounding that claim are in issue.

*McCarty v. Hosp. Corp. of Am.*, 580 N.E.2d 228, 231 (Ind. 1991). Additionally, in

*McCarty*, the Indiana Supreme Court provided guidance on applying Ind. Tr. R.

15(c):

> Therefore, we now hold that the factual circumstances that gave rise to
> the original claims, the general injuries sustained, and the general
> conduct causing those injuries constitute the "conduct, transaction or
> occurrence" referred to in Rule 15(C). Thus, it is these factual
> circumstances that must be examined to determine whether relation
> back is proper.
>
> One guide to conducting this inquiry is to determine whether evidence
> tending to support the facts alleged in the amended complaint could or
> would naturally have been introduced under the former pleading to
> support the original complaints. So long as the factual circumstances
> upon which the amendment is based are similar to those in the initial
> complaint, a change in legal theory does not create a new "cause of
> action". An amendment stating an entirely new claim for relief is
> permissible so long as it arises from the same factual circumstances
> pled in the initial complaint.

In Plaintiffs' original complaint, damages were sought for injuries suffered by

Plaintiffs resulting from an undiscovered medical emergency of E.N. that occurred

on a school bus of Defendant.[130]   E.N. was identified as a disabled child[131] subject to

an IEP at Eastridge Elementary School[132], that E.N. had specific transportation

needs and protocols[133], and that Defendant was aware of the importance of the

---

[130] **Exhibit 17** - Original Complaint.
[131] *Id.* ¶ 17
[132] *Id.* ¶ 18
[133] *Id.* ¶ 20-22

training[134]. Specifically, it was specifically alleged that "Defendant[] received information about E.N.'s condition well prior to April 19, 2018 and knew or should have known the importance of proper training and procedures."[135] Additionally, the original Complaint contained broad claims of negligence which were not limited in scope.[136]

In Plaintiffs' amended complaint, damages were <u>again</u> sought for injuries suffered by Plaintiffs resulting from a medical emergency of E.N. that occurred on a school bus of Defendant.[137] While the legal theories may be changed in the amended complaint, the underlying factual basis does not. What was added factually is simply information learned through discovery of what led to the injuries. Factual information that would have also been presented under the original complaint to show negligence on the part of Defendant. Defendant references in their motion that additional "aspects" were added to the Amended Complaint (*i.e.,* education, evaluations, related services, placement, and polices/customs).

The same question underlying the original Complaint underlies the Amended Complaint: <u>What led to the injuries suffered by E.N. during a medical emergency on Defendant's school bus on April 19, 2018?</u> Discovering new facts of what led to that failure does not prohibit relation back. The Defendant states that they are prejudiced because they would defend a negligence case differently from IDEA, Section 504, ADA, or Section 1983 claim based on different legal standards of the

---

[134] *Id.* ¶ 23-25
[135] *Id.* ¶ 25
[136] *Id.* ¶ 39-45
[137] Amended Complaint

claims. Defendant's secondary assertion is that it would have conduced differently. The Amended Complaint was filed after granting of Plaintiffs' motion for leave by the State Court on July 14, 2021. Defendant was originally in possession of the Amended Complaint on April 26, 2021 as an exhibit to the motion for leave to amend. Defendant removed the matter to federal court on August 3, 2021. Extensive discovery and depositions had been conducted while in state court. The federal case management plan provided for a non-expert witness discovery deadline of June 3, 2022. Defendant conducted **no** discovery beyond one single request for admission regarding a request for a due process hearing. Defendant made no request for additional depositions, made no request for additional documentation, made no request for additional interrogatories, and made no further attempt at discovery in the lengthy time it had to do so. Further, Defendants are the ones who maintained the IEP and educational records. It is unclear what investigation they could not have done.

Under Indiana State law, a plaintiff need only plead the operative facts involved in the litigation, as Indiana is a "Notice Pleading" state. See *State v. Rankin*, 294 N.E.2d 604 (Ind. 1973); See also *Martin v. Shea*, 463 N.E.2d 1092, 1093 (Ind. 1984); See also Ind. Tr. Rule 8(A). Per the 'notice pleading' rule, a clear and concise statement putting a defendant on 'notice' as to what has occurred and of the plaintiff's theory they intend to pursue for recovery is all that is needed. Nothing would have barred Plaintiffs from presenting the facts discovered during discovery in support of their claims of negligence.

28

Defendant now appears to be attempting to penalize Plaintiffs for being **to** specific and being to open and providing to many facts to the Defendant when amending their Complaint. As set forth in detail, the additions of Counts IV – VIII relate back to the original date of filing. Defendant does not assert that if in fact they relate back, that they would still be barred by the statute of limitations and time barred.

### 3. <u>Actions may lie under § 1983 for violations of the IDEA and Section 504.</u>

Defendant's argument on this point only pertains to the § 1983 portions of the Counts V and VI. The entire argument of Defendant is that the Court should ignore binding precedent, *Marie O. v. Edgar*, 131 F.3d 610, 621-22 (7th Cir. 1997), explicitly permitting these exact claims and "revisit" the issue of whether an IDEA or Section 504 claim can be brought under § 1983 based upon the holding of *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113 (2005). Defendant's request does not provide any analysis as to why a holding by this Court should actually be any different than that which it is bound by, *Marie O*. Defendant does not dispute that the facts alleged by Plaintiffs, if true, would rise to a claim under § 1983. Defendant also concedes that presently in the Seventh Circuit, IDEA and Section 504 claims are appropriate for § 1983. *Marie O.*, 131 F.3d at 621-22.

Preliminarily, as no actual argument is provided as to why a decision by this Court should be different then binding precent beyond just citing *Rancho*, a telecommunications case, this argument is undeveloped, waived and cannot be developed further in a reply brief: "[A] party cannot use a reply brief as a forum to

make novel arguments that were available at the time it filed its original motion." *Trs. of the Will County Local 174 Carpenters Pension Trust Fund v. FCJ Real Estate Dev. Co.*, No. 07 C 3362, 2008 U.S. Dist. LEXIS 100137, 2008 WL 5211130, *2 (N.D. Ill. Dec. 10, 2008) (citing *Multi-Ad Svcs., Inc. v. NLRB*, 255 F.3d 363, 370 (7th Cir. 2001). There is no argument for Plaintiffs to respond to. Defendant ignores the fact that *City of Rancho* analyzes another statutory scheme, a telecommunications act, and does not make any reference to the IDEA and Section 504. Defendant also seems to cast aside that *Marie O.* is binding precedent. Defendant further ignores the repeated statements of the Supreme Court in *Palos Verdes* that there must be caution in deciding that a § 1983 cause of action is foreclosed. Noting the longstanding preference for § 1983 actions, Justice Stevens in his concurrence wrote "…that only an *exceptional* case – such as one involving an unusually comprehensive and exclusive statutory scheme – will lead us to conclude that a given statute impliedly forecloses a § 1983 remedy." *City of Rancho*, 544 U.S. at 130.

Even if the Court were to consider ignoring binding precedent, pursuant to 20 U.S.C. § 1415(l), it is clear that the § 1983 remedy is available. Pursuant to the express language of, and the legislative intent behind, § 1415(l)[138], IDEA claims are appropriate for a § 1983 cause of action.[139]

> **4.   Material questions of fact exist as to whether Defendant refused to provide a reasonable modification and intentionally acted on the basis of E.N.'s disability to discriminate based on disability, which must be determined by a jury**

---

[138] Previously codified at 20 U.S.C. § 1415(f) (2000).
[139] *Id.;* Suzanne Solomon, *The Intersection of 42 U.S.C. sec. 1983 and the Individuals with Disabilities Education Act*, 76 Fordham L. Rev. 3065 (2008); *contra A.W. Jersey City Public Schools*, 486 F.3d 791 (3rd Cir. 2013).

Defendant claims that, **as a matter of law**, Plaintiffs have not and cannot present any factual evidence to support their position that Defendant refused to provide a reasonable modification by bad faith or gross misjudgment pertaining to Plaintiffs' direct and § 1983 claims contained under Counts VI and VII relating to Section 504 and the ADA.[140] Defendant's unsupported, conclusory statements fail for several reasons.

First, Defendant limits its argument to only one of the three ways to establish disability discrimination under Section 504 and the ADA; that being that "the defendant refused to provide a reasonable modification..."[141] However, Defendant's analysis ignores Plaintiffs' allegations that Defendant "engaged in willful misconduct" in its failure to provide E.N. FAPE and follow E.N.'s IEP.[142] Defendant's analysis further ignores Bluth's findings that Defendant "recklessly disregarded Federal and State regulations, policies and procedures regarding the provision of the related service transportation for children with disabilities... [that] created substantial risk of life-threatening harm to [E.N.]..."[143] At the very least, the designated evidence presents a material question of fact whether Defendant's actions were taken in bad faith or constituted gross misjudgment. Thus, summary judgment is inappropriate.

---

[140] Dkt. 37, Defendant's Brief in Support, p. 25.
[141] Dkt. 37, Defendant's Brief in Support, p. 24-25. Quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999) ("(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.").
[142] **Exhibit 15**, Amended Complaint, ¶135.
[143] **Exhibit 3** – Dr. Bluth Rep., p. 4-5.

Second, Plaintiffs have alleged facts and have designated evidence that, at the very least, raise material questions of fact as to whether Defendant intentionally acted on the basis of E.N.'s disability, that being the first way the Seventh Circuit has recognized to establish disability discrimination under Section 504 and the ADA. *Washington,* 181 F.3d at 847. The majority approach to determining intentional discrimination is to apply a deliberate indifference standard. *Everett v. Baldwin*, 2016 U.S. Dist. LEXIS 5595, at *32-33 (N.D. Ill. Jan. 15, 2016). The deliberate indifference standard does not require that Defendant hold "personal animosity or ill will but rather may be inferred when there is knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id.* (citations omitted). Here, Plaintiffs' designated evidence raises a material question of fact as to whether Defendant knew of the danger posed to E.N. by the failure of the bus monitor to be appropriately trained and informed on the child specific needs to identify and provide services to E.N. pursuant to the IEP.[144] In her report, Bluth describes several widely accepted safety practices and procedures that were not implemented by Defendant that are intended to protect children like E.N., and that Defendant disregarded the importance of safe school transportation.[145] These safety standards, along with E.N.'s IEP the Case Conference Committee's notes that both the driver and bus monitor on E.N.'s bus required Diastat training due to E.N.'s needs, including E.N.'s history of seizures and physical condition, should have alerted

---

[144] **Exhibit 3** – Dr. Bluth Rep., p. 4 (opinion 1), p. 14 (opinion 2), p. 16 (opinion 3), p. 22 (opinion 4), p. 25 (opinion 5), p. 27 (opinion 6), p. 29-31 (section 2.2).
[145] **Exhibit 3** – Dr. Bluth Rep., p. 7-10.

Defendant that E.N. could very likely suffer a seizure on the bus ride home which would require implementation of the seizure protocol and administration of Diastat.[146]  However, Defendant failed to act on that likelihood, which is supported by the designated evidence. Accordingly, a material question of fact exists as to whether Defendant acted with deliberate indifference to intentionally act on the basis of E.N.'s disability and, therefore, summary judgment is inappropriate.

Lastly, Defendant's argument attempts to persuade the Court to find that, as a matter of law, no material question of fact is present for an inquiry involving a finding of whether gross misjudgment or bad faith existed or not, which are generally fact-sensitive inquiries. See *Crowder v. Kitagawa*, 81 F.3d 1480, 1485-86) (9th Cir. 1996) ("the determination of what constitutes reasonable modifications is highly fact-specific requiring case-by-case inquiry"). This paired with the designated evidence that contradict, or at the very least raise material questions of fact to Defendant's conclusory statements that it never failed to reasonably accommodate. Accordingly, summary judgment is inappropriate.

**5. Summary Judgment is inappropriate for Plaintiff's Substantive Due Process Claim because material questions of fact exist as to whether Defendant's actions caused a state-created danger, which was plead in Plaintiffs' Amended Complaint under Indiana's notice pleading standard.**

Lastly, Defendant raises several arguments claiming that Plaintiffs' Substantive Due Process claims fail as a matter of law. Each of Defendant's arguments are bellied by the designated evidence that raise material questions of fact as to whether Defendant caused a "state-created danger" invoking claims under

---

[146] **Exhibit 11** – October30, 2017 CCC Report, at p. 9-15.

33

the Due Process Clause.[147] Defendant correctly states that, in order to establish a substantive due process claim under a state-created danger theory, Plaintiffs must "demonstrate that: (1) [Defendant], by its affirmative acts, created or increased a danger that [E.N.] faced; (2) [Defendant's] failure to protect [E.N.] from danger was the proximate cause of [E.N.'s] injuries; and (3) [Defendant's] failure to protect [E.N.] 'shocks the conscience.'" *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011). Despite Defendant's claims that Plaintiffs cannot point to a policy or custom of Defendant that led to the state-created danger, Plaintiffs have designated evidence that provides expert testimony that clearly and unambiguously opines that Defendant "recklessly disregarded Federal and State regulations, policies and procedures" regarding transportation of E.N.[148] Furthermore, E.N.'s injuries were proximately caused by Defendant's failure to follow the IEP that it, along with Plaintiffs, agreed to implement to, in large part, protect E.N.[149] Accordingly, Plaintiffs allegations are plainly based upon policy and/or custom of Defendant that led to the state-created danger.

Secondly, Defendant claims that no facts exist that would raise a material question of fact that Defendant's actions were "outrageous, uncivilized, and intolerable."[150] Defendants point to the actions taken by the bus driver and monitor on April 19, 2018, or more appropriately their failure to act, as being mere

---

[147] Initially, Defendant claims that "Plaintiffs Amended Complaint does not explicitly invoke the 'state-created danger' exception…" [Dkt. 37, at p. 29]. However, Plaintiffs plead sufficient facts to place Defendant on notice of Plaintiffs' claims, which is all that is required by Indiana's Notice Pleading standard as more thoroughly discussed above.

[148] **Exhibit 3** – Dr. Bluth Rep., p. 4

[149] **Exhibit 10**, August 10, 2017 CCC Report; **Exhibit 11** – October 30, 2017 CCC Report; **Exhibit 12**, January 26, 2018 CCC Report.

[150] [Dkt. 37, at pg 30] (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999))

negligence.[151] However, the actions that shock the conscience by Defendant were the failures the Defendant caused by placing E.N. in the care of an inadequate and improperly trained bus monitor who had just previously failed a drug screen and been recommended for termination.[152] Whether the Defendant's actions would "shock the conscience" has support from Plaintiffs' designated evidence, specifically that "[i]n over 42 years, specializing in special education and special needs transportation, I have known of no other instance, without exception, in which a school bus driver suspended from their position, for the failure to comply with a drug test transportation policy and procedure was re-instated approximately fourteen (14) days after her suspension and considered suitable to supervise and monitor vulnerable children with disabilities on a school bus."[153] This evidence alone raises a material question of fact as to whether Defendant's actions would "shock the conscience." Accordingly, summary judgment is inappropriate.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

---

[151] [Dkt. 37, at pg 30]
[152] **Exhibit 3** – Dr. Bluth Rep., p. 10-11.
[153] **Exhibit 3** – Dr. Bluth Rep., pg. 11.

Respectfully submitted,

WALDRON TATE BOWEN SPANDAU LLC

/s/ Brandon E. Tate
Brandon E. Tate, Atty. No. 31531-49
Benjamin A. Spandau, Atty. No. 34207-49
Katherine A. Piscione, Atty. No. 37166-49
156 East Market Street, 5th Floor
Indianapolis, Indiana 46204
317.296.5294
F: 317.423.0772
brandon@wtbs-law.com
ben@wtbs-law.com
katie@wtbs-law.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been served on all counsel of record via the Court's ECF Filing System on the same date of filing.

/s/ Brandon E. Tate
Brandon E. Tate